IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Lee Ann Campbell,                          :

      Plaintiff,                       :

  v.                                       :      Case No. 2:04-cv-0339

Washington County Public           :      MAGISTRATE JUDGE KEMP
Library, et al.,
                                :
      Defendants.

<u>OPINION AND ORDER</u>

This matter is before the Court on cross-motions for summary judgment filed by plaintiff Lee Ann Campbell[1] and defendants Washington County Public Library Board of Trustees, Larry Nash White, Kathryn Piekarski, and Doug Unsold (collectively known as the "library defendants"). This case has been referred to the Magistrate Judge for full disposition under 28 U.S.C. §636(c). For the following reasons, the library defendants' motion for summary judgment will be granted, Ms. Campbell's motion for partial summary judgment will be denied, and this case will be dismissed.

I.

The following facts are taken from depositions and affidavits submitted in conjunction with the parties' motions for summary judgment.[2] Ms. Campbell was hired by the Washington County Library

_____

[1] Ms. Campbell moves for summary judgment only the issue of liability.

[2] This Court notes that both parties cited depositions that were not part of the record in their supporting memoranda accompanying their respective motions for summary judgment. Pursuant to this Court's local rules and the Federal Rules of Civil Procedure, those depositions will not be considered in this Opinion and Order.

("library") in June 1995.  Her most recent position before her termination in December 2003 was reference manager.

Beginning in July 2001, pursuant to the Family Medical Leave Act of 1993 ("FMLA"), Ms. Campbell used accrued sick leave to take time off work to care for her mother.  From July 2001 to May 2003, Ms. Campbell missed a total of thirty days of work.

In 2002, the library hired a consultant, Terry Locy,[3] to conduct interviews with certain library staff members to improve intra-library communication and efficiency as well as the library's service to the general public.  After learning of some problems in Ms. Campbell's department, Ms. Locy was instructed by the interim library director, Sandra Starr, to interview Ms. Campbell and her staff to evaluate their performances and identify problems.  Ms. Locy's interviews and evaluations revealed, among other things, that Ms. Campbell lacked sufficient supervisory skills to be a successful and effective reference manager.  During the same time period, library staff members were asked to fill out surveys and questionnaires regarding their supervisor's managerial skills.  Consequently, Ms. Campbell evaluated Ms. Starr's performance and indicated that she felt that Ms. Starr was a "poor supervisor" who "supervised by gossip."  (Dep. of Sandra Starr at p. 76.)

In September 2002, as a result of Ms. Locy's evaluations, Ms. Starr placed Ms. Campbell on probation for 120 days.  Additionally, Ms. Starr implemented a corrective action plan to assist Ms. Campbell in improving her managerial skills.  The record indicates that Ms. Campbell was the only known library employee placed on probation.[4]

---

[3] There are two variations of Ms. Locy's first name in the deposition transcripts - Terry and Terri.  Both variations are referring to the same person.

[4] The record is unclear as to whether Ms. Starr saw Ms. Campbell's evaluation of her prior to implementing the corrective action plan.

Ms. Campbell successfully completed her probationary period and demonstrated signs of improvement in supervising her department. At Ms. Campbell's request, she continued to have regular meetings with the new library director, Dr. White, to discuss library efficiency and her performance. The record states:

> Q. And in February she responds to your request for employee feedback: Larry, I'd like to have monthly coaching session - or monthly coaching sessions, meetings with you, and you say yes, and you conduct some of those meetings, which you say are partly coaching. How is - how are the monthly coaching sessions that she has, which you said was in response to her request for feedback, how are those related to the earlier coaching sessions with Terry Locy during her probationary period?
>
> A. It is my understanding that a part of her training with Terry Locy was on learning how to work better with her staff members, and as part of our monthly meetings I would present her with feedback on what I felt was her improvement or areas of continued improvement in those areas.
>
> The topic had been brought up during the training with Terry and one of the things that Lee requested from me in the early meetings was please provide me feedback with how we're doing, in terms of relating to staff. And so, from our monthly meetings forward it - a part of the discussion was what is going on, clarification of questions. But part of it would also be feedback on her working relationships with staff in her department.

(Dep. of Larry White at p. 73-74.)

After Ms. Campbell's last FMLA leave in May 2003, she returned to work and resumed her full-time status. According to Ms. Campbell, Dr. White removed some of her supervisory responsibilities, and, as a result, Ms. Campbell filed a complaint with the United States Department of Labor on August 15, 2003. Ms.

Campbell states:

> Prior to my most recent FMLA leave which began on May 17, 2003, for a total of nine (9) days in May 2003, but after I commenced this usage of FMLA leave, Larry Nash White, Director of the Library, attempted to remove and/or reduce my responsibilities before I completed this usage of FMLA leave. Dr. White told me that he was going to remove the lab duties from my responsibilities. I asked him if it was because I had been gone so much. He denied it. But when asked, he said it was because it was too hard to supervise two areas on different floors - Reference was one floor above the computer lab. He then told me he was going to give the duties to Susan Wells. This information caused me to believe it was because of my time off and not because of the physical location because Susan Wells worked three floors above the computer lab. As a result of disbelieving Dr. White's reasoning at the attempted reduction in duties, I requested that my sister in Connecticut and my sister-in-law in Virginia come to help care for my mother so that I would not lose my job or job responsibilities. ***
>
> In May 2003, I was able to return to work from caring for my mother, after using my FMLA in intermittent fashion since July 2001. And again because of the attempted reduction in duties, I made every effort to reduce or completely eliminate the hours I needed to care for my mother. However, because this was not a realistic expectation given her illness, I took steps to ensure I could care for her without losing my job. Since the Board had refused to discuss any part of the 2002 probation in part resulting from the "she is often not even there" comment, and Dr. White had given deceptive information about the rationale for the reduction in responsibilities, I felt that I had no choice but to contact the United States Department of Labor to protect my rights under the FMLA.

(Aff. of Lee Campbell at ¶¶8-9.) Moreover, prior to her

4

termination, Ms. Campbell claims that her responsibilities were diminished beginning in September 2003.  The record states:

> On September 29, 2003 and thereafter, Dr. White proceeded to treat me differently from other Library employees who had not exercised their rights under the FMLA in the following manner, including, but not limited to: (1) Adding "MLS (Masters of Library Science degree) preferred" to the qualifications for the Library Assistant (reference department only), enabling Justin Mayo to apply, even though when Mr. Mayo advised me that he had an interest in working in Reference, I expressed to Dr. White that I had reservations about Mayo obtaining that position because of my prior observations of his performance (to which, Dr. White screamed at me saying "This is not being created for Justin Mayo!"); (2) Removing the Mezzanine Duty from my responsibilities on September 29, 2003 (Cathy Piekarski was aware of this removal of duties as I heard her testify in her deposition ...); (3) Soon after September 29, 2003, Dr. White reduced my responsibilities as Reference Manager in several other respects; (4) On October 14, 2003, Dr. White violated the Board's Recruitment and Selection Policy regarding internal applicants relative to the Reference Department vacancy; (5) On October 16, 2003, Dr. White disbanded the Planning Team, of which I had recently been appointed coordinator; (6) On October 17, 2003, I was not permitted to distribute extra department hours as I had previously been given the discretion to do; (7) on October 17, 2003, and November 4, 2003, and November 8, 2003, with regard to position vacancies, Dr. White removed my authority to select, interview and then hire whom I chose for my staff, all of which I had been allowed to do in July 2003 before Dr. White learned of my complaint to the Department of Labor, which was also in violation of the Board policy of giving internal applicants "preferential consideration" ....

(Id. at ¶15.)

5

In November 2003, Ms. Campbell was designated to choose potential candidates to fill a library assistant position. Once the candidates were chosen, Ms. Campbell was instructed to interview the potential employees using a list of questions provided to her by Dr. White. It appears from the record that Ms. Campbell failed to choose qualified candidates for the position and also deviated from the set of questions provided. Further, Ms. Campbell also made inappropriate remarks about the potential employees. First, Ms. Campbell made comments to other library employees about a potential employee, Crystal Downer, who allegedly is covered under the Americans with Disabilities Act ("ADA"). Second, it appears that Ms. Campbell fabricated negative comments about Justin Mayo, the person ultimately hired for the position. Based on this conduct, Ms. Campbell received a verbal reprimand.

A short time thereafter, Dr. White appeared in front of the library's board of trustees ("board") to inform them of Ms. Campbell's conduct and her verbal reprimand. Based on this conduct, as well as Ms. Campbell's prior conduct, the board suspended Ms. Campbell for two weeks without pay. At the conclusion of her suspension, Ms. Campbell was notified that the library was restructuring and reorganizing and that the library no longer needed her services.

Ms. Campbell filed an appeal to the Ohio State Personnel Board of Review, but it concluded that it did not have jurisdiction over the matter. In March 2004, Ms. Campbell filed a complaint in Ohio state court asserting protections afforded to classified civil servants under Ohio law. The Ohio court dismissed the case, determining that Ms. Campbell was an at-will employee and not subject to special protections. Finally, Ms. Campbell filed a charge of discrimination with the Ohio Civil Rights Commission, and, after an investigation, the Commission issued Ms. Campbell a Dismissal and Notice of Rights.

6

Ms. Campbell brought suit in this court alleging, *inter alia*, retaliation for advising the library that a potential employee may be covered under the ADA; retaliation in violation of the FMLA; and wrongful discharge in violation of Ohio public policy. Both parties have moved for summary judgment.

II.

Fed. R. Civ. P. 56(c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)(emphasis in original); Kendall v. The Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is,...[and where] no genuine issue remains for trial,...[for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 467 (1962); accord, County of Oakland v. City

7

of Berkley, 742 F.2d 289, 297 (6th Cir. 1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for a directed verdict. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson, 477 U.S. at 250.

> The primary difference between the two motions is procedural: summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted. Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 745, n. 11 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970) (footnote omitted); accord, Adams v. Union Carbide Corp., 737 F.2d 1453, 1455-56 (6th Cir. 1984), cert. denied, 469 U.S. 1062 (1985). Inferences to be drawn from the underlying facts contained in such materials must be considered in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Watkins v. Northwestern Ohio Tractor Pullers Association, Inc., 630 F.2d 1155, 1158 (6th Cir. 1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify

8

denial of a motion for summary judgment. <u>Adickes</u>, 398 U.S. at 157-60; <u>Smith v. Hudson</u>, 600 F.2d 60, 65 (6th Cir.), <u>cert. dismissed</u>, 444 U.S. 986 (1979).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. <u>Anderson</u>, 477 U.S. at 251. As is provided in Fed. R. Civ. P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 259 (1968) (footnote omitted).

*FMLA*

In Ms. Campbell's memorandum in support of her motion for summary judgment, she argues that "there is no genuine dispute of material fact as to the Defendants' retaliatory motive in suspending Ms. Campbell from her employment for purported performance deficiencies and misconduct. The evidence clearly demonstrates that Ms. Campbell was suspended and laid off in retaliation for her complaining to the U.S. Department of Labor

9

over Family and Medical Leave Act violations." (Plaintiff's Motion for Partial Summary Judgment at p. 15.) Additionally, Ms. Campbell highlights other examples of retaliation that allegedly resulted from her exercise of her protected FMLA rights. Conversely, the defendants assert that they did not violate the FMLA. Specifically, the defendants highlight the fact that Ms. Campbell was never denied FMLA leave nor was she retaliated against for using FMLA leave.

Because Ms. Campbell is attempting to prove a FMLA violation with indirect evidence, the Sixth Circuit Court of Appeals has adopted the burden-shifting approach established in McDonnell Douglas Corp. v. Green, 411 U.S. 492 (1973). Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 315 (6th Cir. 2001). Under this analysis, Ms. Campbell must first establish a *prima facie* case of retaliation in violation of the FMLA. To do this, Ms. Campbell must demonstrate that (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment action; and (3) that a causal connection exists between the adverse employment action and the exercise of her rights under the FMLA. See, e.g., Edgar v. JAC Products, Inc., 443 F.3d 501, 508 (6th Cir. 2006); Skrjanc, 272 F.3d at 314. If Ms. Campbell satisfies these three requirements, then the burden shifts to the library defendants to proffer a legitimate, nondiscriminatory rationale for the adverse job actions. Id. Once the library defendants do this, the burden shifts back to Ms. Campbell to prove that the articulated reason is in reality a pretext to mask discrimination. See Skrjanc, 272 F.3d at 315.

In the instant case, the library defendants admit that Ms. Campbell exercised the rights afforded to her under the FMLA. The library defendants argue, however, that Ms. Campbell did not suffer any adverse employment action. Further, assuming, *arguendo*, that Ms. Campbell did suffer adverse action, the library defendants

10

claim that the adverse action was not causally connected to Ms. Campbell's use of FMLA leave.

In order to demonstrate an adverse employment action, the plaintiff must show that the adverse action is material. Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405, 2415 (2006). A material adverse employment action is one which "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (citing Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) and Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)). This may include more than those actions that preclude "hiring," prompt "discharge," or alter "compensation, terms, conditions, or privileges of employment." Burlington Northern, 126 S.Ct. at 2412-14.

In support of their argument that Ms. Campbell did not suffer adverse employment action, the library defendants cite Soletro v. Nat'l Fed. of Ind. Businesses, 130 F.Supp.2d 906 (N.D. Ohio 2001), Robinson v. Franklin County Bd. of Commerce, No. 99-cv-162, 2002 WL 193576 (S.D. Ohio Jan. 28, 2002), and Darby v. Bratch, 287 F.3d 673 (8th Cir. 2002). Those cases do not support the defendants' position. For example, in Soletro, the Court concluded that a forced transfer to another employment position after the plaintiff took FMLA leave was an adverse employment action. See Soletro, 130 F.Supp.2d at 913. Similarly, in Darby, the Court concluded that failing to promote a plaintiff or disciplining a plaintiff for using FMLA was adverse employment action. See Darby, 287 F.3d at 679-80; see also Robinson, 2002 WL 193576 at *10 (concluding that "[w]hile Robinson may be able to establish the first two elements of the claim," there was no causal connection between the adverse employment action and the FMLA leave).

Like the Soletro and Darby courts, this Court concludes that, at a minimum, there is a factual issue about whether Ms. Campbell

11

suffered material adverse employment actions prior to her termination.  The actions which took away some of her duties and responsibilities [word missing from following insert?? ]<u>her suspension</u>, and her termination in December 2003 could both be considered such actions.[5]  (See Aff. of Lee Campbell at ¶15.) Thus, the question becomes whether there is any evidence of a causal connection between these adverse employment actions and the exercise of Ms. Campbell's FMLA rights.

A causal connection may be established either through direct evidence or knowledge coupled with a closeness in time that creates an inference of causation.  <u>See</u> <u>Wrenn v. Gould</u>, 808 F.2d 493, 501 (citing <u>Burrus v. United Telephone Co.</u>, 683 F.2d 339, 342 (10th Cir. 1982)).  In proving a causal link between protected activity and adverse employment action, a plaintiff must demonstrate that the employer would not have taken the adverse action "but for" the employee's protected conduct.  <u>See</u>, <u>e.g.</u>, <u>Allen v. Dep't of Corrections</u>, 165 F.3d 405, 413 (6th Cir. 1999)("In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action").  "Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation."  <u>Id.</u>  However, temporal proximity alone is insufficient to support an inference of causation in a case where retaliatory discrimination is alleged.

---

[5] Given the facts of this case, adding "Master of Library Science degree preferred" to a job description is not a material adverse employment action.  <u>See</u> <u>Burlington Northern</u>, 126 S.Ct. at 2415 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms")(emphasis in original).

<u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 563-66 (6th Cir. 2000).

In the instant case, Ms. Campbell claims that the direct evidence of a causal connection is the fact that Dr. White was "upset" when he learned of Ms. Campbell's complaint to the U.S. Department of Labor. (Plaintiff's Motion for Partial Summary Judgment at p. 19.) Further, Ms. Campbell highlights a conversation that was overheard by another employee in which Dr. White and Ms. Starr mentioned the Department of Labor complaint and Ms. Campbell's suspension. (<u>Id.</u> at p. 20.) These instances are not direct evidence of retaliation, however. Specifically, according to the testimony cited by Ms. Campbell, Dr. White was "upset" because he felt that Ms. Campbell did not believe him when Dr. White told Ms. Campbell that her probation period was "something in the past" and that Dr. White "was not judging her on that." (Dep. of Sandra Starr at p. 85.) Moreover, in that same deposition excerpt, Ms. Starr explains that Dr. White wanted to make sure that Ms. Campbell was never denied FMLA leave. (<u>Id.</u>) Finally, without more specifics about what was said between Ms. Starr and Dr. White, the second-hand conversation cited by Ms. Campbell, in which the suspension and the Department of Labor complaint were concomitantly discussed, do not constitute direct evidence of retaliation.

Additionally, Ms. Campbell failed to provide evidence that the library defendants treated her differently than other similarly situated employees. Ms. Campbell highlights examples where she allegedly received discipline that was more strict than required under the library's disciplinary policy. However, nowhere in the record does Ms. Campbell provide examples where other employees performed similar acts but received different discipline. In fact, to the contrary, the record contains examples of other employees who, like Ms. Campbell, were terminated or lost employment at the library. (<u>Id.</u> at pp. 59-64.) Perhaps, most importantly, the

13

record does not contain any evidence that Ms. Campbell was treated differently than other employees who used FMLA leave.

Ms. Campbell's burden of proving a *prima facie* case is not an onerous one. See, e.g., Skrjanc, 272 F.3d at 315 ("A plaintiff's burden of proving a *prima facie* case is not intended to be an onerous one"). Although there is no direct evidence of causation, the library defendants' knowledge of Ms. Campbell's use of FMLA leave and the filing of the Department of Labor complaint, coupled with the temporal proximity of the filing of that complaint - August 15, 2003 - to the alleged retaliatory acts, most of which occurred in September to November 2003, is sufficient, in this case, to create an inference of causation. See, e.g., Jootsberns v. United Parcel Service, Inc., 166 Fed.Appx. 783, 793-94 (6th Cir. 2006)(2 months sufficient to establish a causal connection in a FMLA claim); Parnell v. West, No. 95-2131, 1997 WL 271751 at *3 (6th Cir. May 21, 1997)(unpublished)(internal footnote omitted) (time lag of less than six months usually sufficient to establish causal connection); but see Cooper v. City of North Olmsted, 795 F.2d 1265, 1272-73 (6th Cir. 1986)(four months is insufficient to establish causal connection). Accordingly, the burden shifts to the library defendants to proffer a legitimate, nondiscriminatory rationale for their actions.

In proving a legitimate, nondiscriminatory rationale for discharging an employee or altering a material work condition, the library defendants bear only the burden of production, not the burden of persuasion. Put simply, the library defendants must articulate a "valid rationale" for the adverse employment action. Hartsel v. Keys, 87 F.3d 795, 800 (6th Cir. 1996). In cases like this, where the defendants claim a reorganization or "reduction in force" as the reason the plaintiff suffered material adverse employment actions, the reorganization explains why the adverse employment action occurred but does not explain why the plaintiff

14

was targeted. <u>Tye v. Bd. of Ed. of the Joint Vocational School</u>, 811 F.2d 315, 319 (6th Cir. 1987). Additionally, therefore, the library defendant must proffer a legitimate reason why Ms. Campbell was chosen. <u>Id.</u>

In the instant case, the record is clear that Ms. Campbell lost job duties, did not gain job duties, and ultimately lost her job, because the library was reorganizing and the reference manager position was being eliminated. Further, the record indicates that Ms. Campbell was not offered another position at the library because of Ms. Campbell's actions. In regards to the loss of job duties, which include the mezzanine service point, the record states:

> Q. What is that document?
>
> A. It is a mem – appears to be a copy of a memo from myself to Lee Campbell.
>
> Q. And what's it about?
>
> A. Mezzanine service point.
>
> Q. What is the Mezzanine Service Point?
>
> A. It was a service desk on the Mezzanine level of the building that we were planning on. It had been a point that had not been staffed in the past and we, through feedback from the public, felt that we could offer an extended service by providing staffing for that service point on the Mezzanine.
>
> Q. Now, you'll notice in the last section, last paragraph, Lee suggests that the Mezzanine supervisory duties remain under the reference manager purview; is that correct?
>
> A. That's correct.
>
> Q. Now, to what extent do these new duties relating to the Mezzanine service point, to what extent did they already exist, or were these brand new duties?

15

A. There were going to be some existing duties and some new duties. Existing duties would have been circulating material, answering questions from the public. New duties would have been to provide readers advisory service and to provide bibliometric - or bibliographic instruction to teach people how to use the tools and resources of the library.

Q. Now, would the existing duties have been duties that were under Lee's purview as reference manager?

A. Circulation would have been - checking out materials in under circulation. Answering questions, depending on the question, would have been something that reference would have done.

Q. Okay. And then what happened with her suggestion that these duties be under her, the Mezzanine service duties?

A. I believe, if I recall correctly - yes, I believe it went to the extension services manager.

Q. That's not Lee; right?

A. That's correct.

Q. Okay. Why at that point did you decide not to give those duties to Lee?

A. The position was going to be more of an adult programming position. That was not something that reference was currently doing, and it was not something that Ms. Campbell expressed an interest in doing.

When the concept was first brought up the extension services manager had also been a reference department staff member and had been dealing primarily with delivering library services to adults and to doing adult programming [sic]. And it made more logical sense at that time to put that position under that person for supervision.

16

(Dep. of Dr. White at pp. 64-66.) Dr. White also provided insight on how the computer lab was eventually eliminated.

> Q. Okay. And the extension service manager ends up effectively taking over some of the old duties of the reference department; correct?
>
> A. To some degree, yes.
>
> Q. Okay. Specifically, what duties of the old reference department were eliminated or are no longer being performed as a result of your reorganization?
>
> A. Well, the computer lab's no longer with us. That - that function of what reference used to do is no longer there.
>
> Q. So it's not - it doesn't exist?
>
> A. Doesn't exist.

(Id. at p. 137.)

In reference to Ms. Campbell's termination due to reorganization, the record states:

> Q. Okay. So [Ms. Campbell], in your opinion, did not lose her job for disciplinary reasons; is that correct?
>
> A. From my understanding that position was restructured. The organization was undergoing a process and that position was viewed as unnecessary.
>
> ***
>
> Q. Okay. Was Lee's separation from employment related to disciplinary reasons?
>
> A. No.
>
> Q. Okay.
>
> A. It was organizational restructuring.

17

Q. Okay.  So the reference manager position was eliminated; correct?

A. Correct.  And it would - at this point - that point in time it would not have mattered whether Ms. Campbell was that person or not. It was position that was eliminated.

Q. Okay.  And then the duties of the reference manager position, were they being reassigned or redistributed?

A. A little of both.  And some of them are actually enhanced or eliminated because the - the focus of the department became providing access to information wherever you are, whether inside or outside the building.  So that department is responsible for both indoor and outdoor programming, indoor and outside assistance, questions, bibliographic instruction, adult programming.

     So some things were added to the old reference department because we merged a lab from downstairs up to the reference area.  We brought extension services over and put everybody under one roof.  We basically combined two departments and three work sections in one department and one work section.  And Barb Wainwright was asked to serve temporarily as the acting department head for access services.  And some of the those responsibilities - I think the vast majority of the responsibilities for running that department were given to her.  And Susan Wells was demoted from supervisor to assistant department head to - in access services to assist with running the department.

***

Q. Now, I want to get to the actual decision to reorganize.  Tell me how the decision to reorganize came about.  And I guess I want to start with Paragraph 28 and 29 where you seem to describe a reorganization process.  And tell me how it led to - I understand this is kind of a long question.  But I want you to

18

explain to me how we get from a 14-day suspension on December 3rd to a layoff, pursuant to reorganization, two weeks later.

A. The restructuring process actually begins in March or April 2003. When we started consolidating departments and moving staff around we consolidated the - as we reviewed earlier with your organizational chart we consolidated the collection development department and the technical processing department into one department called collection services. We took home bound delivery and outreach and merged them with the extension services department to create one department that dealt with adult outbound, or home bound delivery, in providing library service outside of the walls.

We were beginning the process of looking at how resourcing staff usage was conducted and done, matching them against need, and looking at predictions of what finances or resources would be available down the road.

We started evaluating usage of activities and services the library provides. We conducted a library customer survey, requesting feedback on what was needed, what were the priorities, in terms of the patrons viewpoint of what the library should be doing. We conducted a great deal of analysis of what the organization was doing and started addressing resource issues. So the process actually starts in March or April of 2003 and is actually still in progress.

We went through the merge of collection services and technical processing. We created a strategic information manager's position. We merged the three adult outbound groups into one department. We reduced hours at the New Matamoras location. We closed them on Thursdays because usage indicated that their workload on Thursdays was dramatically low.

We have looked at closing other branches, Barlow and Belpre - or sorry, Barlow and

Beverly, due to resource considerations over the last year.

We have merged extension services with what used to be reference into what is now called access services. We have removed the computer lab, replaced it with a teen room. The teen room ran for about a year. And after usage assessment we decided that it was not productive, and so the teen room was also removed.

We have not filled out hours and positions as we have moved things around. We have talked about merging circulation with access services, but that was not something that we could prove to work out, in terms of did it make sense.

There's very little of this library system that hasn't been either assessed, affected, or changed in the last two years.

(Id. at pp. 135-37; 130-33) Moreover, Dr. White provided this explanation on why Ms. Campbell was not offered another position at the library.

Q. In the proposal/recommendation portion you talk about your consideration of all of the aforementioned challenges and the organization's need to respond to these challenges; correct?

A. Correct.

Q. Isn't it clear that the restructuring is in part to address deficiencies you perceived on the part of the reference manager?

A. In part.

Q. Okay.

A. But again, this was a process that started about eight months prior and was - and is actually still going on.

20

Q. But specifically you reference in this document the suspension of the reference manager; correct?

A. Correct.

Q. Would you agree that the timing of the reorganization or restructuring, which resulted in the elimination of Lee's job, is coincidental, coming two weeks after her suspension?

A. Some would view it that way.

***

Q. Okay. And in Paragraph 36 of your affidavit -

A. Yes.

Q. - you discuss why she was not offered another position within the library; correct?

A. Correct.

Q. And you talk about the failure to obtain meaningful results, despite two years of effort to assist her in addressing significant deficiencies in her job skills; correct?

A. Correct.

Q. And by the effort to assist her in addressing significant deficiencies, you're talking about the coaching sessions?

A. In part.

Q. Okay.

A. Also, the training sessions provided by Terry Locy, and anything else that may have been provided prior to my arrival.

Q. Okay. But the training sessions by Terry Locy were in part successful, were they not, because Lee was released from probation?

21

A. She completed and attended the classes, yes.

Q. Okay. Well, if the completion of the classes was not satisfactory, in some other way didn't you have the ability to extend the probation?

A. Yes.

Q. Okay. So didn't you do some assessment of whether or not the attendance of the coaching sessions was successful –

A. Yes.

Q. – or satisfactory?

A. Yes.

Q. Okay. And at least to the extent necessary to get her off probation you deemed that she had satisfactorily completed those training sessions with Terry Locy; correct?

A. Correct.

Q. Okay. And you didn't again, determine that she was not performing satisfactory until November 8th of 2003; correct?

A. Correct.

(Dep. of Larry White at pp. 157-60.)

As evidence of Ms. Campbell's "significant deficiencies" in Ms. Campbell's job skills that precluded her from being rehired, the library defendants highlight Ms. Campbell's 2002 evaluation that led to her probationary period. Additionally, the library defendants cite Ms. Campbell's actions surrounding Justin Mayo's hiring, which include, *inter alia*, Ms. Campbell's alleged defamatory remarks about the applicants, her inability to follow Dr. White's explicit instructions, her desire to exclude Ms. Downer from the interview process, and her adamant rejection of Justin

Mayo.  First, with regards to her probationary period, the record states:

> Q.  Okay.  Did you direct [Ms. Locy] to interview any other employees specifically in relation to Lee Campbell?
>
> A.  After she did her interviews with the current Reference employees, she asked me if there was anyone else she could talk to.  And I referred her to previous Reference employees.
>
> Q.  Were any of those not – I mean, not current employees of the library at that time?
>
> A.  They were all current employees.
>
> Q.  Okay.  And what precipitated your volunteering these other names to be interviewed?
>
> A.  Because Terri was concerned with the information she was getting from the current employees.
>
> Q.  What was that information that she was concerned with?
>
> A.  Part of it was the public service aspect and part of it was – I would say how they reported they were treated.
>
> Q.  Did you believe at that point that Lee Campbell was mistreating her employees?
>
> A.  Actually, this whole thing started because the employees complained that they couldn't – they weren't allowed to serve the public.  They felt like there were time restraints on how much time they could spend with the patron.  They were very restricted on what they could do; they weren't allowed to renew books for patrons.  Lee had felt that was a Circulation job.
>
> I think the whole thing started with a public service issue.  And really, I didn't –

23

they didn't share any of the information that
they shared with Terry, with me.

***

Q. Do you know what Terry Locy's conclusion
was as to Lee's department and Lee's behavior
in particular?

A. I think - a conclusion.  I'd have to look
at the report.

Q. Do you remember if it contained anything
negative about Lee?

A. Yes, it did.

Q. Do you recall if Lee was disciplined for
anything as a result of the information that
came out in Terri's report?

A. There was a corrective action plan written
in response to that report.

***

Q. Could you describe them?

A. I had a corrective action plan with four
points from Terry Locy's report.  And I
requested that Lee work with Terri to improve
her performance.

Q. Any specific areas where you recommended
that her performance be improved?

A. Supervisory skills.  I think that was the
main issue ....

(Id. at pp. 31-32, 38, 47.)  Second, with regards to the
interviewing and hiring of Justin Mayo, the record states:

Q. Do you recall anything about that
discussion?

A. I had some concerns that the - had some
concerns that the right questions hadn't been
used.  I had some concerns about how the

24

candidates had been evaluated in preparation for being interviewed.  And also had some concerns about the characterization made by Mrs. Campbell of the applicants.

Q. What were those concerns?  Could you be more specific?

A. I think that was - and I might be confusing two meetings.  But I think that was in relation to a meeting we had in November where I related to her my concerns about the interview process; that qualified applicants had not been selected for interview, that nonqualified applicants had been placed ahead of qualified applicants, and that some of the comments made by Ms. Campbell during the process when the committee was meeting were inappropriate.

Q. So you believe that she had selected the wrong applicants for interview, is that my understanding?

A. In going through and rating applicants, according to the advertised criteria, the candidates that were rated highest among those advertised criteria, not all of them had been called to interview.

Q. So this meeting we discussed though was after - was after the fact, wasn't it? I mean, Justin Mayo had already been selected by the time you had this meeting with - with Lee in November?

A. No. I think we had this discussion, some of it, beforehand because -

Q. Before what? I'm sorry.  When you say beforehand?

A. Before the interview session.

Q. Go ahead.

A. Because - because of the concerns I had and - in talking with Ms. Campbell about who she

25

wanted to interview I had gone back and looked at the applications and had matched the applications up against the criteria, and when I went through and evaluated each of the candidates based on advertised criteria, we had qualified applicants who had not been interviewed.

\* \* \*

Q. And I think in another section of the affidavit ... you talk about the legality or input. And in Paragraph 20 you talk about the legality of certain language she used in her review of applicants. Tell me how these comments and the e-mail ... constitute either defamatory or illegal communications about Justin Mayo.

\* \* \*

A. During the - this is a portion, but the vast majority was said verbally, and after the interview session, in the company of committee that was doing the review.

Q. That would be Janet Becker and yourself and Lee; right?

A. Correct. And Ms. Campbell indicated that she had talked to a variety of staff members who indicated that Justin had been a problematic employee and that she had spoken to his former supervisor, Carol Clark, and that Carol Clark had indicated that he was a very problem employee.

In follow-up to what Ms. Campbell stated I met with Ms. Clark and I met with the Belpre employees about the three employees, and every person denied ever stating anything to Mrs. Campbell for any reason whatsoever. Indicated that everything that had been said was very erroneous. And the former supervisor produced a copy of Justin's evaluation for when he had previously worked at the library. That was a very good evaluation. And stated that she had never been approached by Mrs. Campbell for any

26

comments or any information relating to Justin Mayo.

\* \* \*

Q. What did she say in relation to Crystal Downer that you found improper?

\* \* \*

A. And in discussing that with her Mrs. Campbell indicated that she had inquired of Crystal's medical condition and existing abilities from Carol Kulich, who was the circulation supervisor downstairs, and indicated that she had discovered that Crystal had had a stroke and would not really be able to be considered for the position because she had had a stroke.

Q. So her improper inquiry was the inquiry directed to Carol Kulich; is that correct?

A. It's - for me it was deciding that - in her own words, deciding not to interview her, as we were discussing this, because she felt that Crystal Downer - because of the results of the stroke - would not be able to perform the work, and therefore she was not being interviewed.

    And in follow-up, she had mentioned that she had talked to Carol Kulich about this and that she did not feel that she would be able to do the work.  Then she let me know she felt that her mental inabilities would not be appropriate for the position.

\* \* \*

Q. Okay.  What specifically did she say was objectionable verbally about Crystal Downer?

A. That she was - that she had - basically that she was retarded.

Q. Wait a minute.  Did she say retarded?  Did she say the word retarded?

27

A. She said that there was - there - there was - that Crystal did not have the mental faculties or abilities to do that position, and that she was - retarded may not be the exact word, but that was the impression that she sure left with me. That she made the indication that because she was - she suffered brain damage from her stroke that she couldn't do the job.

\*\*\*

Q. \*\*\* And do you believe that this part is objectionable or something improper for her to tell you: You do need to know that Crystal would fall under ADA. Is that proper?

A. In the way it's written here potentially, but in the verbal discussions that were done while we were talking about this candidate it went much further than that.

\*\*\*

Q. Okay. But here, that sentence telling you that as director that she could fall under ADA, that part's not objectionable or improper, is it?

A. That's not - my interpretation of the statement was that she was letting me know that she felt she did not have to hire her because of ADA.

Q. Okay. But that's not what that last sentence says, is it?

A. My perception of that sentence is - in combination with what she said to me previously, verbally as well, my perception of that statement was that she felt she would not have to hire or interview Crystal because she would not have - it was because of reasonable - unreasonable accommodations.

\*\*\*

Q. Okay. I want to move ahead on December

28

3rd. And let's - okay. You have in front of you documents which are marked from yesterday's deposition ....

Dr. White, would you identify those documents for the record, please?

A. No. 11 appears to be a copy called interview questions reference staff, has a note on it saying Lee's questions. The No. 12 appears to be a copy of the interview questions labeled correct questions for direct - per director's instructions.

Q. Are those the questions that varied, which you were previously referencing, in the interview for position ultimately obtained by Justin Mayo?

A. Yes.

***

Q. What were the questions that Lee prepared versus the instructions that you instructed her to ask?

A. The - wasn't so much that the questions are objectionable as, per statement and previous direction. I had requested that she use the questions that have already been used in previous positions. And she, for whatever reason, did not use the same questions.

Q. And how did you instruct her to use the questions from previous interviews?

A. I explained to her that I wanted her to use the questions labeled 12, as per normal interviewing practice. These are the questions that we had used for all library assistant - most library assistants, if not all. Most I would say.

Q. How did you ask her to - or instruct her to ask just the questions which are marked Exhibit 11 I believe?

29

A. I stated you will use these questions in the interview process.

Q. So you told her verbally?

A. Yes, I told her verbally.

***

Q. *** Okay. Have we reviewed everything for which you gave her a verbal reprimand; the comments about Crystal Downer, the comments about Justin Mayo, the difference in the questions from the ones you instructed her to answer - to ask?

A. No.

Q. Okay. We are not - go ahead. What else?

A. The last item was when the committee was voting to - after completing all the interviews the committee was ranking the candidates. The committee voted two to one that Justin Mayo had been the best interviewed candidate. Lee noted that - she informed me she would not accept that decision, that she wanted to reopen the interviews and interview people that she wanted to interview, because she did not want to work with Mr. Mayo. I explained that the committee had voted two to one and that we weren't going to reopen interviews to go back after people, especially since the people that we had interviewed had been more exceptional than the people she wanted to interview.

Q. Okay.

A. I was then informed that she would not abide by that decision.

(Dep. of Larry White at pp. 88-90; 97-98; 105-08, 110-12, 116-17.)

Given the library defendants' restructuring scheme and Ms. Campbell's conduct, which included alleged defamatory remarks and insubordination, this Court concludes that the library defendants

30

met their burden of production by articulating a valid rationale for why Ms. Campbell experienced adverse employment actions. Additionally, the record is clear and uncontradicted that the library defendants have provided legitimate reasons for not giving Ms. Campbell supervision duties over the mezzanine area of the library and why Ms. Campbell was not offered employment after the reference manager position was eliminated. These reasons are bolstered when supplemented by the fact that the library was continually reorganizing, which included other employees' losing hours and vacancies not being filled. (Id. at p. 86.) Thus, the burden is now shifted to Ms. Campbell to prove that the articulated reason is in reality a pretext to mask discrimination.

In order for Ms. Campbell to demonstrate that the library's rationale is in reality a pretext for discrimination, Ms. Campbell may establish that the library's reasons have no basis in fact, did not motivate the discharge, or were insufficient to warrant discharge. Wexler v. White's Fine Furniture, 317 F.3d 564, 576 (6th Cir. 2003). Ms. Campbell may also meet her burden by showing that the library's reason for discharge were not credible. Peters v. Lincoln Elec. Co., 285 F.3d 456, 470 (6th Cir. 2002). Prevailing in demonstrating that the library defendants proffered reasons are a pretext for discrimination only permits, but does not compel, the Court to find discriminatory intent, which is Ms. Campbell's ultimate burden of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993).

Here, Ms. Campbell argues "pretext" by claiming that her actions were insufficient to justify taking away her supervising duties or to warrant her discharge. Specifically, Ms. Campbell argues that the questions she used in the interview were the exact same questions Dr. White previously gave her. (Plaintiff's Motion for Partial Summary Judgment at pp. 20-21.) Moreover, Ms. Campbell contends that her comments about Ms. Downer and the ADA were to

inform Dr. White that Ms. Downer could potentially be covered by the ADA, so the library should accommodate her to prevent a potential lawsuit.  (Id. at 22.)

Beginning with the interview questions, this Court notes that some of Ms. Campbell's argument is supported by evidence outside the record.  For example, Ms. Campbell asks the Court to compare the questions Ms. Campbell asked at the interview to the questions presented to her by Dr. White to prove that the question sets were identical.  Those questions are not in the record.  The only evidence the Court has concerning the questions is Dr. White's deposition testimony that the questions were different.  Further, Ms. Campbell refers the Court to the Ethan Frank-Collins' deposition, which, again, is not in the record.  Therefore, this Court rejects Ms. Campbell's "pretext" argument based on Ms. Campbell's use of incorrect questions during the interview process.

Turning to the ADA argument, Ms. Campbell cites the Court to an excerpt from Ms. Starr's deposition.  That excerpt states:

> Q. So it's your belief she was trying to point out.  "Hey, here's a potential liability issue because she is covered under the ADA;"  is that correct?
>
> A. Yes.

(Dep. of Sandra Starr at p. 92.)  This excerpt, alone, could appear to bolster Ms. Campbell's argument that she did not make defamatory remarks about this employee and was attempting to alert the library to a potential ADA problem.  However, this excerpt is taken out of context.  The entire relevant portion states:

> Q. *** And because the suspension and the termination occurred, like, within a couple weeks of each other, was it in the same first occasion that you learned of plans of possibly terminating Lee or was the suspension first by itself?
>
> A. The suspension was discussed in relation to

the E mail and the interview process.  Yes.

Q. "In relation to the E mail and the interview process."  Could you describe more specifically what you mean?

A. There was the E mail where Lee did not want to interview Crystal Downer.

***

Q. And do you recall, in essence, why she didn't want to interview Crystal Downer?

A. She did make note that Crystal would fall under ADA.

Q. All right.

    And then in Email she made a note that Crystal would fall under ADA, that's why she didn't want to interview her?

***

A. Well, I know she said - Larry had said he wanted to interview her and Lee said, I think, that her list was different.

Q. Her - okay.

A. And that she didn't feel that Crystal was capable.

    She had talked to Carol Kulich in Circulation, and there was a determination that she probably couldn't keep up the pace.

***

Q. Did you gather from that why [Ms. Campbell] was reluctant to interview [Ms. Downer]?  Or did [Ms. Campbell] see a problem for the library in interviewing [Ms. Downer]?  What was the gist of what you got from Lee's E mail?

A. I think the part about where she had talked

33

to another supervisor.

Q. Who had?

A. Lee had talked to - and I think it was Carol Kulich.

Q. Okay.

A. And I think there was something said about not being able to keep up.

Q. In your mind, was Lee raising concerns about ADA problems or liability on the part of the library?

A. I don't know why else she would have mentioned it.

Q. So it's your belief she was trying to point out, "Hey, here's a potential liability issue because she is covered under the ADA;" is that correct?

A. Yes.

Q. And in addition you believe that she felt that [Ms. Downer], from her information from Carol Kulich, couldn't do the job?

A. Uh-huh.

Q. Is that correct?

A. Yes.

(Id. at pp. 89-92.)  According to Ms. Campbell, she claims:

I was suspended, in part, for my comment via an electronic mail transmission to Dr. White that he needed to know that an applicant would "fall under [the] ADA" ... in order to make certain that he followed all procedures to ensure fairness in hiring.  Prior to this, another manager, Belpre Branch Manager, Leslie McKernan, failed to hire a hearing impaired applicant, requiring the Library to add another position when the applicant's father,

> who was an attorney, complained. She received
> no discipline whatsoever, a fact I heard
> Sandra Starr confirm in her deposition.

(Aff. of Lee Campbell at ¶16.)

Ms. Campbell claims that her remarks about Ms. Downer and the ADA were to "inform" the library defendants about a possible ADA applicant. However, this claim is rebutted by Dr. White's testimony, which revealed that Ms. Campbell sought to exclude Ms. Downer from being interviewed because she fell under the ADA. Ms. Starr's deposition testimony corroborates this statement. Significantly, nowhere in the record does Ms. Campbell deny this allegation, and, without such evidence, a jury could not reasonably reject Dr. White's explanation. See Manzer v. Diamond Shamrock Chemical Co., 29 F.3d 1078, 1083 (6th Cir. 1994)("Accordingly, once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, we hold that the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation"). Thus, based on Ms. Starr's and Dr. White's deposition testimony regarding Ms. Campbell's remarks about Ms. Downer, which testimony has not been refuted by Ms. Campbell, this Court concludes that there are no genuine issues of material fact regarding whether the library defendants reason for Ms. Campbell's discharge was a pretext for discrimination.

In sum, no genuine issues of material fact exist regarding whether the library defendants violated Ms. Campbell's FMLA rights.

*ADA*

42 U.S.C. §12203(a) prohibits an employer from retaliating against an employee engaged in ADA protected activity. The statue states:

> No person shall discriminate against any
> individual because such individual has opposed
> any act or practice made unlawful by this
> chapter or because such individual made a
> charge, testified, assisted, or participated

35

> in any manner in an investigation, proceeding,
> or hearing under this chapter.

42 U.S.C. §12203(a). Like a FMLA claim, an ADA retaliation claim utilizes the burden-shifting analysis established in McDonnell Douglas. See, e.g., Kuriatnyk v. Township of Bazetta, Ohio, 93 Fed.Appx. 683, 687 (6th Cir. 2004)(citing Canitia v. Yellow Freight System, Inc., 903 F.2d 1064, 1066 (6th Cir. 1990))(applying Title VII burden-shifting analysis to ADA retaliation claim); Clark v. City of Dublin, Ohio, 178 Fed.Appx. 522, 525 (6th Cir. 2006)(same).

In the instant case, Ms. Campbell claims that "having heard of the Library's legal entanglement with a hearing impaired applicant, and not being fully educated on the provisions of [the ADA], she presumed that Crystal Downer would be entitled to the ADA's protections, and advised her superior so that the hiring process would be correctly and lawfully handled." (Plaintiff's Partial Motion for Summary Judgment at p. 23.) Contrarily, the library defendants contend that Ms. Campbell's ADA claim fails because she did not engage in protected activity. Specifically, the library defendants argue that Ms. Campbell's words and conduct did not encompass the type of activity that the ADA was enacted to prevent.

According to the wording of 42 U.S.C. §12203, it is unlawful for the library to discriminate against Ms. Campbell if Ms. Campbell "opposed any act or practice made unlawful" by the ADA. Assuming Ms. Campbell's testimony to be true - i.e. her comments were designed to alert Dr. White of a candidate who may be protected under the ADA - this Court concludes that such information does not constitute the opposition to an unlawful act or practice. Instead, it appears that Ms. Campbell merely "alerted" the library defendants that one potential employee could be covered by the ADA. Put simply, nowhere in the record does Ms. Campbell offer evidence that the library was engaged in conduct prohibited by the ADA, and Ms. Campbell does not suggest that she

36

opposed any alleged illegal conduct by the library that is
prohibited under the ADA. Without such allegations and supporting
evidence, Ms. Campbell has failed to establish a *prima facie* case
for retaliation under the ADA.[6]

            *Discharge in Violation of Ohio Public Policy*

     According to the record, Ms. Campbell was an at-will employee
working for the Washington County Library at the time of her
discharge. See Campbell v. Washington County Library, No. 04CA44,
2005-Ohio-2992 (4th Dist. June 10, 2005). Under Ohio law, at-will
employees may be terminated for any reason except when the
termination contravenes clear public policy. See, e.g., Painter v.
Graley, 70 Ohio St.3d 377, 382 (1994). In order to prove a
wrongful termination in violation of public policy, a plaintiff
must demonstrate that (1) there is a clear public policy; (2) that
the circumstances surrounding the employee's dismissal jeopardize
that public policy; (3) that the dismissal was motivated by conduct
related to the public policy; and (4) that the employer lacked an
overriding legitimate justification for dismissal. Id. at 384-85.

     In the instant case, Ms. Campbell argues that being terminated
for using FMLA leave violates public policy. Moreover, she
contends that disciplining an employee for "expressing that an
individual may be covered by the ADA" jeopardized the public policy
that the ADA was enacted to protect. Conversely, the library
defendants contend that because Ms. Campbell cannot successfully
prove her FMLA and ADA claims, she cannot maintain an additional
claim for wrongful discharge in violation of public policy.
Additionally, the library defendants argue, alternatively, that

---

[6] The Court also highlights Dr. White's and Ms. Starr's
uncontradicted testimony regarding Ms. Campbell's conduct and
statements about Ms. Downer. In particular, the Court points to
Dr. White's deposition testimony, which indicated that Ms. Campbell
did not want to interview Ms. Downer *because* of her alleged
disability. (Dep. of Dr. White at pp. 108-10.)

assuming the first three elements of <u>Painter</u> are met, Ms. Campbell cannot prove the fourth element because the library defendants have articulated an overriding legitimate justification for Ms. Campbell's dismissal.

As this Court previously highlighted, the record supports only an inference that Ms. Campbell was terminated because the library reorganized and restructured. Further, the record is clear that Ms. Campbell was not offered another job after the reorganization because of insubordination and her actions and comments surrounding the interviewing and hiring of Justin Mayo. Based on Ms. Campbell's conduct, which is described in detail, *supra*, this Court cannot conclude that the circumstances surrounding Ms. Campbell's dismissal jeopardize employees from utilizing FMLA leave or alerting an employer that a potential employee could be covered by the ADA. Additionally, because of Ms. Campbell's conduct, most of which superseded her FMLA use, this Court cannot conclude that her dismissal was related to the FMLA or the ADA. Finally, assuming, *arguendo*, that Ms. Campbell could prove the first three <u>Painter</u> elements, as this Court previously noted, Ms. Campbell failed to prove that library defendants lacked a legitimate justification for her discharge. There are no genuine issues of material fact relating to whether the library defendants wrongfully discharged Ms. Campbell in violation of public policy.

III.

Based on the foregoing, the library defendants' motion for summary judgment (#37) is GRANTED. Ms. Campbell's motion for partial summary judgment (#42) is DENIED. The case is DISMISSED WITH PREJUDICE.


/s/ Terence P. Kemp
United States Magistrate Judge

38